UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

WILLIAM SAMMONS and JANIE
SAMMONS, as legal guardians
of A.S., an incapacitated adult,

      Plaintiffs,

v.                              Case No. 8:04-cv-2657-T-24 EAJ

POLK COUNTY SCHOOL BOARD,

      Defendant.

_____/

## **ORDER**

This cause comes before the Court on Plaintiffs' Motion for Summary Judgment (Doc. No. 74) and Defendant's Motion for Judgment on the Record (Doc. No. 73). Both motions are opposed. (Doc. No. 81, 82).

## **I.  Background**

Plaintiffs are the parents and legal guardians of A.S., a nineteen-year-old, non-verbal male with Asperger's Syndrome, a form of autism. During the 2003-2004 school year, A.S. was a senior in high school.

On or about October 6, 2003, Plaintiffs and Defendant Polk County School Board agreed upon an Individual Education Plan ("IEP") for A.S. The October 6, 2003 IEP stated that one of A.S.'s priority educational needs was the ability to express his ideas in written form.

Thereafter, on or about February 23, 2004, at an annual review of A.S.'s IEP, Plaintiffs were informed that A.S. would graduate in May of 2004 if he received all of his academic credits. Additionally, in the February 23, 2004 IEP, Defendant proposed eliminating any goals that required A.S. to complete written work. Plaintiffs objected to the proposed graduation and

the elimination of the written work requirement.  In response to Plaintiffs' objection to the

February 23, 2004 IEP, Defendant issued Plaintiffs an Informed Notice of Refusal, dated

February 23, 2004, rejecting Plaintiffs' proposal not to graduate A.S. or to change his diploma

option from a standard diploma to a special diploma.

On April 20, 2004, Plaintiffs wrote a letter to Defendant notifying Defendant of

Plaintiffs' opposition to the February 23, 2004 proposed IEP.  Plaintiffs stated in the April 20,

2004 letter that they were formally requesting either a new IEP meeting or mediation on the

issue.  In this letter, they also stated that they did not want A.S. to graduate and that they

intended to challenge any IEP that was proposed to be a terminal IEP.  Additionally, Plaintiffs

requested that Defendant conduct additional evaluations of A.S.

After receiving Plaintiffs' April 20, 2004 letter, Defendant responded on May 7, 2004

that it would schedule a new IEP meeting and that the request for specific evaluations of A.S.

would be referred to A.S.'s IEP team.  Additionally, on May 7, 2004, Defendant sent Plaintiffs a

meeting notice scheduling the new IEP meeting for May 21, 2004.  Among the reasons given for

the new IEP meeting was that the diploma option and IEP would be reviewed.

Rather than hold the new IEP meeting with Plaintiffs on May 21, 2004 as represented by

Defendant, Defendant attempted to graduate A.S. before his parents realized that there would not

be a new IEP meeting and before Plaintiffs filed a request for a due process hearing.  Plaintiffs

filed their request for a due process hearing on May 17, 2004.  However, Defendants took the

position that A.S. graduated prior to the request for a due process hearing–on May 13, 2004

when A.S.'s teacher turned in his grades.  This Court has previously found that Defendant is

estopped from arguing that A.S. graduated prior to Plaintiffs' filing their request for a due

process hearing.  (Doc. No. 70).

In their request for a due process hearing, Plaintiffs requested an emergency injunction to enjoin Defendant from involuntarily graduating A.S.  (Doc. No. 8-5).  Additionally, Plaintiffs alleged that Defendant did not provide A.S. with an appropriate education, and they requested an order requiring Defendant to draw up a new IEP that addressed the alleged deficiencies.  (Doc. No. 8-5).

In response Defendant filed a motion to clarify the issue before the Administrative Law Judge ("ALJ").  (Doc. No. 8-14).  In the motion, Defendant noted that Plaintiff "seems to be possibly challenging the appropriateness of the past IEPs, the child's past educational program, transition planning and whether A.S.'s education was provided in the least restrictive environment."  (Doc. No. 8-14).  However, Defendant argued that the only issue that the ALJ could address was whether A.S. met the requirements for a regular high school diploma, because A.S. had graduated prior to the request for a due process hearing.  (Doc. No. 8-14).

Plaintiffs responded that the issues before the ALJ should include the appropriateness of prior IEPs and whether A.S. received a free appropriate public education ("FAPE").  (Doc. No. 8-20).  The ALJ ruled that the only issue to be addressed at the hearing was whether A.S. met the requirements to receive a regular high school diploma.  (Doc. No. 8-21).

The ALJ held a three-day hearing.  During the hearing, the ALJ stated that the scope of the hearing was limited to whether A.S. met the requirements to receive a regular high school diploma, because A.S. graduated prior to the request for a due process hearing.  (Doc. No. 8-32, p. 22, 27, 84, 88-89).  For that reason, the ALJ excluded all evidence regarding A.S.'s IEPs and whether A.S. received FAPE.  (Doc. No. 8-32, p. 85-86, 88-89, 387).  However, the ALJ did not

3

exclude any evidence regarding the issue of whether A.S. met the requirements to receive a regular high school diploma, including whether A.S. actually earned the credits that he was awarded.  (Doc. No. 8-32, p. 90-92).

After the hearing, the ALJ issued an order finding that A.S. met the requirements to receive a regular high school diploma.  (Doc. No. 8-31).  The ALJ found that pursuant to Florida law, in order for A.S. to graduate with a regular high school diploma, he had to pass the required portions of the FCAT and earn twenty-four credit hours in specified academic areas with a 2.0 cumulative grade point average.

The ALJ found that A.S. passed the required portions of the FCAT, with a score of 329 for the math portion (a score of 295 was required in order to pass) and a score of 296 on the reading portion (a score of 287 was required in order to pass).  Additionally, the ALJ found that A.S. also passed the writing portion of the FCAT, which A.S. was not required to pass in order to graduate.  The ALJ also noted that A.S. passed the FCAT on his first attempt, when 36% of Polk County students did not successfully pass the required portions of the FCAT on their first attempt.

The ALJ also found that A.S. earned twenty-four credit hours with a cumulative grade point average of 3.09.  The ALJ found that the evidence established that A.S.'s teacher taught the school-prescribed academic curriculum to A.S. in an acceptable manner.  Additionally, the ALJ found that A.S. was taught from the required textbooks, and the texts were completed as required.  The ALJ also found that A.S.'s teacher assigned A.S.'s grades based on A.S.'s written work and A.S.'s performance.

Thereafter, Plaintiffs filed a four-count complaint in this Court for injunctive and other

equitable relief.  (Doc. No. 1).  In Count I, Plaintiffs request a review of the administrative

determinations of the ALJ under the IDEA, because Plaintiffs allege that the ALJ made the

following errors: (1) improperly limiting issues and excluding evidence regarding A.S.'s IEPs

and whether A.S. received FAPE; (2) making findings of fact without allowing Plaintiffs the

opportunity to present evidence regarding those facts; (3) improperly refusing to consider

whether A.S.'s IEP goals and objectives were met; (4) improperly refusing to consider whether

Plaintiffs received adequate notice of A.S.'s graduation; and (5) improperly relying on A.S.'s

FCAT score in concluding that A.S. met the other graduation requirements.  In Count II,

Plaintiffs request injunctive relief enforcing A.S.'s stay-put rights and compensatory education.

In Count III, Plaintiffs assert a § 1983 claim due to Defendant's alleged violations of the IDEA.

In Count IV, Plaintiffs request a review of the administrative determinations of the ALJ under

state law.  Currently before the Court are two motions: (1) Plaintiffs' motion for summary

judgment, and (2) Defendant's motion for judgment on the record.

## II.  Individuals with Disabilities Education Act ("IDEA")

The IDEA provides parents with an opportunity to present complaints with respect to any

matter relating to the identification, evaluation, or educational placement of their child, or the

provision of a free appropriate public education to their child.  <u>See</u> 20 U.S.C. § 1415(b)(6).[1]

When parents make a complaint under § 1415(b)(6), the parents are entitled to an impartial due

---

[1]The IDEA was recently amended by Congress, effective July 1, 2005.  The amendments
renumber some of the sections and subsections of the statutes implicated in this case and make
minor revisions to the text of those sections and subsections.  However, since the amendments do
not apply retroactively, the Court will refer to the 1997 version of the sections and subsections
throughout this Order.  <u>See</u> <u>J.M. v. Kingsway Regional School District</u>, No. Civ. 04-4046
(RBK), 2005 WL 2000179, at *4 n.5 (D.N.J. Aug. 18, 2005)(citation omitted).

process hearing, which is conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency.  See 20 U.S.C. § 1415(f). Any party aggrieved by the decision made at the due process hearing may file a civil action in a state or district court.  See 20 U.S.C. § 1415(i)(2).  When a party files a civil action, "the court (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  1997 version of 20 U.S.C. § 1415(i)(2)(B)[2].

## A.  IEP

The primary vehicle for implementing the goals of the IDEA and for the delivery of FAPE is the IEP.  See Honig v. Doe, 484 U.S. 305, 311 (1988); School Committee of Town of Burlington, Massachusetts v. Dep't of Educ. of Massachusetts, 471 U.S. 359, 368 (1985); G ex rel. RG v. Fort Bragg Dependent Schools, 343 F.3d 295, 298 (4th Cir. 2003). "School districts are required under the IDEA to create an IEP for each student with a disability."  Fort Bragg, 343 F.3d at 298.  "The IEP is in brief a comprehensive statement of the educational needs of a handicapped child and the specially designed instruction and related services to be employed to meet those needs.  The IEP is to be developed jointly by a school official qualified in special education, the child's teacher, the parents or guardian, and, where appropriate, the child."  Burlington, 471 U.S. at 368 (internal citation omitted).  "An IEP must be amended if its objectives are not met, but perfection is not required."  Loren F. v. Atlanta Independent School System, 349 F.3d 1309, 1312 (11th Cir. 2003)(internal and external citations omitted).

---

[2]Currently, 20 U.S.C. § 1415(i)(2)(C).

**B.  FAPE**

"[A] primary purpose of the IDEA is to ensure that disabled children receive a" free

appropriate public education ("FAPE").  White v. Ascension Parish School Board, 343 F.3d 373,

378 (5th Cir. 2003).  "The term 'free appropriate public education' means special education and

related services that--(A) have been provided at public expense, under public supervision and

direction, and without charge; (B) meet the standards of the State educational agency; (C)

include an appropriate preschool, elementary school, or secondary school education in the State

involved; and (D) are provided in conformity with the individualized education program ["IEP"]

required" under § 1414(d).  1997 version of 20 U.S.C. § 1401(8)[3].  While states must have a

policy that ensures that all children residing in the state with disabilities aged three through

twenty-one have the right to FAPE, the obligation to make FAPE available to all children with

disabilities does not apply to (1) students with disabilities who have graduated from high school

with a regular high school diploma, and (2) children aged eighteen to twenty-one in a state to the

extent that its application to those children would be inconsistent with state law regarding the

provision of public education to children in those age groups.  See 34 C.F.R. § 300.121; 34

C.F.R. § 300.122(a)(3)(i); 34 C.F.R. § 300.122(a)(1).

"The 'free appropriate public education' required by the [IDEA] is tailored to the unique

needs of the handicapped child by means of an" IEP.  Board of Education of Hendrick Hudson

Central School District, Westchester County v. Rowley, 458 U.S. 176, 181 (1982).  Under the

IDEA:

[A] "free appropriate public education" consists of educational instruction

---

[3]Currently, § 1401(9).

specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child "to benefit" from the instruction.  Almost as a checklist for adequacy under the [IDEA], . . . [FAPE] also requires that such instruction and services be provided at public expense and under public supervision, meet the State's educational standards, approximate the grade levels used in the State's regular education, and comport with the child's IEP. Thus, if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied, the child is receiving a "free appropriate public education" as defined by the [IDEA].

Id. at 188-89.

The IDEA does not require that states maximize the potential of handicapped children commensurate with the opportunity provided to other children.  See id. at 189-90.  "By passing the [IDEA], Congress sought primarily to make public education available to handicapped children.  But in seeking to provide such access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful."  Id. at 192.  "[T]he intent of the [IDEA] was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside."  Id.  The IDEA "imposes no clear obligation upon recipient States beyond the requirement that handicapped children receive some form of specialized education."  Id. at195.

The Supreme Court has rejected the proposition that handicapped and non-handicapped children be given equal educational opportunities.  Id. at 198.  The Supreme Court has stated that "furnishing handicapped children with only such services as are available to nonhandicapped children would in all probability fall short of the statutory requirement of 'free appropriate public education.'"  Id. at 198-99.  On the other hand, the Supreme Court has stated that it did not believe that Congress intended the states to furnish "every special service necessary to maximize

each handicapped child's potential." <u>Id.</u> at 199.  As a result, the Supreme Court has stated that "to speak in terms of 'equal' services in one instance gives less than what is required by the [IDEA] and in another instance more." <u>Id.</u> at 199.  Instead, the Supreme Court concluded that "Congress sought primarily to identify and evaluate handicapped children, and to provide them with access to a free public education." <u>Id.</u> at 200.  Accordingly, the IDEA requires that the education to which access is provided be sufficient to confer some educational benefit upon the handicapped child.  <u>Id.</u>

"[T]he 'basic floor of opportunity' provided by the [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." <u>Id.</u> at 201.  The Supreme Court has not attempted "to establish any one test for determining the adequacy of educational benefits conferred upon all children covered by the" IDEA.  <u>Id.</u> at 202.  Furthermore, simply because a handicapped child is advancing from grade to grade in a regular public school system does not mean that the child is automatically receiving a free appropriate public education.  <u>Id.</u> at 203, n.25.

"[E]ach child and his or her IEP must be examined individually in determining whether the child has been provided 'a basic floor of opportunity' that affords 'some' educational benefit. The outcome need not maximize the child's education; adequacy must be determined on a case by case basis in the light of the child's individual needs." <u>Walker County School District v. Bennett</u>, 203 F.3d 1293, 1296 n.10 (11th Cir. 2000).

FAPE "need only be an education that is specifically designed to meet the child's unique needs, supported by services that will permit [the child] 'to benefit' from the instruction." <u>Cypress-Fairbanks Independent School District v. Michael F.</u>, 118 F.3d 245, 247-48 (5th Cir.

1997).  The IDEA only requires that the handicapped child receive "some" or "adequate" educational benefit.  See J.S.K v. Hendry County School Board, 941 F.2d 1563, 1572 (11th Cir. 1991); Devine v. Indian River County School Board, 249 F.3d 1289, 1292 (11th Cir. 2001).  "While a trifle might not represent 'adequate' benefits, maximum improvement is never required."  J.S.K., 941 F.2d at 1573 (internal citation omitted).  "Adequacy must be determined on a case-by-case basis in the light of the child's individual needs."  Id.  The Eleventh Circuit has "define[d] 'appropriate education' as making measurable and adequate gains in the classroom."  Id.

### III.  Summary Judgment Standard in IDEA Cases

"'[S]ummary judgment [in IDEA cases] has been deemed appropriate even when facts are in dispute, and is based on a preponderance of the evidence.'"  Loren F., 349 F.3d at 1313 (quoting Beth B. v. Van Clay, 282 F.3d 493, 496 n.2 (7th Cir. 2002)).  As such, the district court's decision is better described as judgment on the record.  See id. (citations omitted).  Accordingly, the usual summary judgment principles do not apply in an IDEA case.  See id.

"[T]he district court conducts an *entirely* de novo review of the ALJ's findings, and has the discretion to determine the level of deference it will give the ALJ's findings."  School Board of Collier County v. K.C., 285 F.3d 977, 983 (11th Cir. 2002)(internal and external citation omitted).  Furthermore, nothing prevents district judges from fact-finding under Federal Rule of Civil Procedure 52 in IDEA cases–even on a record bearing evidence tendered in addition to the IDEA administrative record–as long as they accord due weight to administrative findings.  See Loren F., 349 F.3d at 1314.  Courts owe some judicial deference to local administrative agency judgments, since administrative agencies are deemed to have expertise in education policy and

10

practice; however, the deference is typically limited to matters calling upon educational

expertise.  See id. at 1314, n.5 (citations omitted); see also Jefferson County Board of Education

v. Breen, 853 F.2d 853, 856 (11th Cir. 1988)(stating that the district court may not "substitute its

own judgment on sound educational policy for those made at the state administrative level");

Walker County, 203 F.3d at 1297 (stating that "the administrative decision in an IDEA case is

entitled to due weight and the court must be careful not to substitute its judgment for that of the

state educational authorities").  As such, "administrative factfindings 'are considered to be prima

facie correct, and if a reviewing court fails to adhere to them, it is obliged to explain why.'"  See

Loren F., 349 F.3d at 1314, n.5 (quoting MM ex rel. DM v. School District of Greenville

County, 303 F.3d 523, 531 (4th Cir. 2002)).  "[T]he extent of the deference to be given to the

administrative decision is left to the sound discretion of the district court which must consider

the administrative findings but is free to accept or reject them."  Walker County, 203 F.3d at

1297-98; see also Jefferson County, 853 F.2d at 857.

The IDEA envisions an independent ruling by the district court based on a preponderance

of the evidence, with the bulk of the evidence coming from the records of the administrative

hearing.  See Jefferson County, 853 F.2d at 856.  The party challenging the administrative

decision bears the burden of persuasion on its claim before the district court.  See Loren F., 349

F.3d at 1313 (citations omitted).  Since Plaintiffs are challenging the administrative decision,

they have the burden of persuasion on their claims before this Court.

## IV.  Plaintiffs' Motion for Summary Judgment

Plaintiffs request summary judgment on three issues: (1) that Defendant violated A.S.'s

stay-put rights, entitling A.S. to injunctive relief and compensatory education; (2) that the ALJ

erred as a matter of law in refusing to consider Plaintiffs' challenge to the February 23, 2004

IEP; and (3) that the ALJ erred as a matter of law in excluding evidence of whether A.S.

received FAPE.

### A.  Stay-Put Rights

This Court has previously found that the stay-put provision[4] was triggered and that A.S.

should be returned to his educational placement as it existed under the October 23, 2003 IEP

during the pendency of these proceedings.  (Doc. No. 70, 72, 78).  Plaintiffs now request that the

Court find that A.S. is entitled to an award of compensatory education as a result of Defendant's

violation of the stay-put provision, and Plaintiffs want the Court to award the compensatory

education on the basis of the motion.

Compensatory education is available as a remedy for a violation of the stay-put

provision.  Section 1415(i)(2) directs the court to grant such relief as it determines is appropriate.

As a result, § 1415(i)(2) "confers broad discretion on the court. The type of relief is not further

specified, except that it must be 'appropriate.'"  Burlington, 471 U.S. at 369.  The Supreme

Court has interpreted this to mean "that the relief is to be 'appropriate' in light of the purpose of

the" IDEA, which "is principally to provide handicapped children with 'a free appropriate public

education which emphasizes special education and related services designed to meet their unique

needs.'"  Id.  Furthermore, "'equitable considerations are relevant in fashioning relief,' and the

court enjoys 'broad discretion' in so doing."  Florence County School District v. Carter, 510 U.S.

---

[4]The "stay-put" provision, set forth in 20 U.S.C. § 1415(j), provides that "during the
pendency of any proceedings conducted pursuant to this section, unless the State or local
educational agency and the parents otherwise agree, the child shall remain in the then-current
educational placement of such child . . . until all such proceedings have been completed."

7, 16 (1993)(quoting <u>Burlington</u>, 471 U.S. at 369, 374).  When fashioning discretionary

equitable relief under IDEA, courts must consider all relevant factors.  <u>See</u> <u>id.</u>

     Compensatory education "builds on the Supreme Court's holding in <u>Burlington</u> that

'appropriate' IDEA relief may include reimbursement for parents who place children in private

school rather than accept a deficient public school IEP."  <u>Reid v. District of Columbia</u>, 401 F.3d

516, 522 (D.C. Cir. 2005).  Courts have reasoned, based on <u>Burlington</u>, that if the IDEA permits

reimbursement for educational services, then it must also allow awards of the services

themselves.  <u>See</u> <u>id.</u>  As such, awards of compensatory education are within the broad discretion

of courts fashioning and enforcing IDEA remedies.  <u>See</u> <u>id.</u> at 523.

     "Under the theory of 'compensatory education,' courts and hearing officers may award

'educational services . . .  to be provided prospectively to compensate for a past deficient

program.'"  <u>Id.</u> at 522 (quoting <u>Fort Bragg Dependant Schs,</u>, 343 F.3d at 308).  "'[C]ompensatory

education is not a contractual remedy, but an equitable remedy, part of the court's resources in

crafting 'appropriate relief.'"  <u>Id.</u> at 523 (quoting <u>Parents of Student W. v. Puyallup School Dist.</u>,

31 F.3d 1489, 1497 (9th Cir. 1994)).  "'[C]ompensatory education involves discretionary,

prospective, injunctive relief crafted by a court to remedy what might be termed an educational

deficit created by an educational agency's failure over a given period of time to provide a FAPE

to a student.'"  <u>Id.</u> (quoting <u>Fort Bragg Dependant Schs,</u>, 343 F.3d at 309).

     "Compensatory education . . . is necessary to preserve a handicapped child's right to a

free education."  <u>Jefferson County</u>, 853 F.2d at 857.  "Also, providing a compensatory education

should serve as a deterrent against states unnecessarily prolonging litigation in order to decrease

their potential liability."  <u>Id.</u> at 858.

13

Courts have rejected a mechanical hour-per-hour formula for awarding compensatory education, since it overlooks the court's equitable focus in granting relief, and in effect, "treats compensatory education as a form of damages–a charge on school districts equal to expenditures they should have made previously." Reid, 401 F.3d at 518, 523; see also Wenger v. Canastota Central School District, 979 F. Supp. 147, 151 (N.D.N.Y. 1997); Puyallup School District, 31 F.3d at 1497. Instead, courts have "adopt[ed] a qualitative standard: compensatory awards should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA." Reid, 401 F.3d at 518. Compensatory education should be formulated to ensure that the student is appropriately educated. See id. at 524. As such, awards of compensatory education require individualized assessments. See id.

Thus, the amount of compensatory education appropriate in a case cannot be determined as a matter of law; rather, formulating an appropriate amount of compensatory education requires a fact-specific exercise of discretion:

> [T]his flexible approach will produce different results in different cases depending on the child's needs. Some students may require only short, intensive compensatory programs targeted at specific problems or deficiencies. Others may need extended programs, perhaps even exceeding hour-for-hour replacement of time spent without FAPE. In addition, courts have recognized that in setting the award, equity may sometimes require consideration of the parties' conduct . . .. In every case, however, the inquiry must be fact-specific and, to accomplish IDEA's purposes, the ultimate award must be reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place.

Id. at 524 (internal citations omitted).

Accordingly, the purpose of compensatory education is to place disabled children in the same position they would have occupied but for the school district's violation of the stay-put provision. Computing compensatory education is a fact-specific analysis that cannot be done

14

without evidence regarding the effect of the violation on A.S.  Furthermore, the evidence may show that no compensatory education is necessary.  See Wenger, 979 F. Supp. at 151 (finding that no compensatory education was appropriate because the plaintiffs failed to show that the student's condition regressed as a result of the defendant's failure to provide an appropriate education in a timely and consistent manner).  Accordingly, Plaintiff's motion for summary judgment on the issue of compensatory education for the violation of A.S.'s stay-put rights must be denied, since there is not sufficient evidence before the Court to allow it to make a fact-specific determination regarding whether compensatory education is necessary.

### B.  ALJ's Determinations

Plaintiffs also request that the Court find that the ALJ erred as a matter of law in refusing to consider Plaintiffs' challenge to the February 23, 2004 IEP and in excluding evidence of whether A.S. received FAPE.  The ALJ excluded this evidence, because the ALJ found that A.S. had graduated before Plaintiffs filed their request for a due process hearing.  (Doc. No. 8-32, p. 85-86, 88-89, 387).  This Court, however, has determined that Defendant is estopped from arguing that A.S. graduated prior to the filing of the request for a due process hearing.  (Doc. No. 70, 72).  Accordingly, since Defendant is estopped from arguing that A.S. graduated prior to the filing of the request for a due process hearing, the ALJ erred in refusing to consider the issues of FAPE and Plaintiffs' challenge to the February 23, 2004 IEP on the basis that A.S. had graduated.

Furthermore, even if Defendant was not estopped from arguing that A.S. graduated prior to the filing of the request for a due process hearing, this Court would still find that the ALJ erred in refusing to consider the issues of FAPE and Plaintiffs' challenge to the February 23,

2004 IEP on the basis that A.S. had graduated.  This is because after a student graduates, he or

she can still seek compensatory education for past denials of FAPE.  See T.S. v. Independent

School District No. 54, 265 F.3d 1090, 1092 (10th Cir. 2001)(stating that the rule that a claim that

FAPE is deficient becomes moot upon a valid graduation only applies where the student does not

contest his or her graduation and where the student is seeking only prospective–rather than

compensatory–relief); Brett v. Goshen Community School Corp., 161 F. Supp.2d 930, 933-34

(N.D. Ind. 2001)(finding that graduation does not moot claims for compensatory education).

Defendant acknowledged, in its motion for judgment on the record and during the hearing on

these motions, that a student who has graduated may seek compensatory education for past

denials of FAPE.  (Doc. No. 73, p. 10).  Furthermore, Plaintiffs specifically stated at the hearing

before the ALJ that their claims could just as easily be construed as requesting compensatory

education as they could be construed as requesting prospective relief.  (Doc. No. 8-32, p. 144-

45).[5]

     Accordingly, the Court grants summary judgment in favor of Plaintiffs on the issue that

---

[5]The Court notes that Defendant argues in its motion for judgment on the record that
Plaintiffs never requested a due process hearing challenging any particular IEP, and as such, they
cannot challenge a particular IEP now.  Thus, Defendant argues that the failure to identify a
particular IEP as not providing FAPE in the due process request means that Plaintiffs have not
exhausted their administrative remedies.  The Court rejects this argument.

     Plaintiffs attempted to challenge prior IEPs in their due process request.  Defendant
acknowledged this in its motion to clarify the issues that it filed in response to Plaintiffs' request
for a due process hearing.  In that motion, Defendant noted that Plaintiff "seems to be possibly
challenging the appropriateness of the past IEPs, the child's past educational program, transition
planning and whether A.S.'s education was provided in the least restrictive environment."  (Doc.
No. 8-14).  The ALJ never considered Plaintiffs' challenge to prior IEPs because he determined
that he could not consider the issue (not because the issue was not raised).  Accordingly, the
Court finds Defendant's argument on this issue to be disingenuous.

16

the ALJ erred in refusing to consider the issues of FAPE and Plaintiffs' challenge to the

February 23, 2004 IEP.  As such, the Court will remand these issues back to the ALJ for further

consideration.

## V.  Defendant's Motion for Judgment on the Record

Defendant moves for judgment on the record, arguing that (1) A.S. had a valid

graduation; (2) the Court should dismiss Count II, since it simply requests remedies and is not an

independent cause of action; (3) Plaintiffs request for attorney's fees under § 1988 is not

available for a violation of the IDEA; and (4) Count IV is duplicative of Count I and should be

dismissed.

### A.  Graduation

Defendant contends that the ALJ was correct that A.S. was properly graduated, since

A.S. met Florida's graduation requirements, and there is no requirement that a disabled student

make progress on his IEP goals and objectives in order to graduate.

Florida Statute § 1003.43 provides that a student who earns 24 credits[6] in specified

academic areas with a 2.0 cumulative grade point average and passes the required portions of the

FCAT shall be awarded a standard diploma.  Pursuant to § 1003.43(4)(a), a district school board

may assign an exceptional student to an exceptional education class for instruction in a basic

course with the same student performance standards as those required of nonexceptional students

in the district school board student progression plan in order to assure exceptional students the

opportunity to meet the graduation requirements for a standard diploma.

---

[6]Florida Statute § 1003.436(1)(a) provides: "For the purposes of requirements for high
school graduation, one full credit means a minimum of 135 hours of bona fide instruction in a
designated course of study that contains student performance standards."

While school boards are required to "modify basic courses, as necessary, to assure exceptional students the opportunity to meet the graduation requirements for a standard diploma[,] . . . [m]odifications to basic courses shall not include modifications to the curriculum frameworks or student performance standards."  Fla. Admin. Code Rule 6A-6.0312.  However, modifications to basic courses may include any of the following: (1) the instructional time may be increased or decreased; (2) the instructional methodology may be varied; (3) special communications systems may be used by the teacher or the student; and (4) classroom test administration procedures and other evaluation procedures may be modified, as specified in Florida Administrative Code Rule 6A-1.0943, to accommodate the student's handicap.  See Fla. Admin. Code Rule 6A-6.0312.

At the administrative hearing, Plaintiffs argued that A.S. did not earn his diploma, and they specifically challenged whether A.S. really earned the credits that he was awarded.  The ALJ did not exclude any evidence regarding this issue.[7]

The ALJ made the following findings, which are supported by the record: A.S. passed the required portions of the FCAT, with a score of 329 for the math portion (a score of 295 was required in order to pass) and a score of 296 on the reading portion (a score of 287 was required in order to pass).  (Doc. No. 8-32, p. 33-34, 55).  A.S. also passed the writing portion of the FCAT, which A.S. was not required to pass in order to graduate.  (Doc. No. 8-32, p. 56).  A.S. passed the FCAT on his first attempt, when 36% of Polk County students did not successfully

---

[7]Plaintiffs initially argue in their response that they have additional evidence to present on this issue, but at the hearing on this motion, they stated that they do not intend to present additional evidence on this issue.  Furthermore, since the ALJ did not exclude any evidence on this issue, it is unlikely that this Court would allow any additional evidence on this issue that existed at the time of the administrative hearing.

pass the required portions of the FCAT on their first attempt.  (Doc. No. 8-32, p. 54).

A.S. was awarded twenty-four credit hours with a cumulative grade point average of 3.09.  (Doc. No. 8-32, p. 30- 31, 38-39, 325).  A.S.'s teacher taught the school-prescribed academic curriculum to A.S. in an acceptable manner.  (Doc. No. 8-32, p. 361-64, 369-70).  A.S. was taught from the required textbooks, and the texts were completed as required.  (Doc. No. 8-32, p. 361-64, 369-70).  A.S.'s teacher, Bruce Thornhill, assigned A.S.'s grades based on A.S.'s written work and A.S.'s performance.  (Doc. No. 8-32, p. 395-99).

Plaintiffs now argue that the ALJ erred when it found that A.S. earned his diploma, because: (1) A.S. did not earn the credits that he was awarded, (2) A.S. did not receive 135 hours of bona fide instruction time per credit awarded, (3) A.S.'s curriculum was improperly modified in violation of state law, and (4) A.S. did not meet all of the goals and objectives of his IEPs.  A review of the transcript of the administrative hearing reveals that Plaintiffs have not met their burden of persuasion on these issues.

### 1.  Curriculum

Plaintiffs argue that the ALJ erred when it found that A.S. earned his diploma, because A.S.'s curriculum was improperly modified in violation of state law.  Florida Administrative Code Rule 6A-6.0312(1) provides that "[m]odifications to basic courses shall not include modifications to the curriculum frameworks or student performance standards."  Plaintiffs argue that A.S.'s curriculum was improperly modified because A.S.'s tests only tested his rote memorization skills, he was not required to complete homework, he did not have a typical high school chemistry lab, and he did not have to produce written assignments, including a high school research paper.

With regards to A.S.'s tests, the evidence does not demonstrate that A.S.'s tests only tested his rote memorization skills.  There was not a lot of evidence presented regarding A.S.'s tests.  Thornhill was asked whether he tested A.S. using multiple choice and true/false questions, and Thornhill responded that he did.  (Doc. No. 8-32, p. 394).  That, alone, does not show that A.S.'s tests only tested his rote memorization skills.[8]

With regards to Plaintiffs' argument that A.S.'s curriculum was improperly modified because A.S. was not required to complete homework, Plaintiffs have not shown that eliminating homework equates to a modification to A.S.'s curriculum.

With regards to Plaintiffs' argument that A.S.'s curriculum was improperly modified because A.S. did not have a typical chemistry lab, the only evidence presented on this issue was A.S.'s father's testimony.  A.S.'s father was asked whether A.S. had a chemistry lab, and he responded, "Did they do a few things related to lab?  Yes.  Did he have a lab, anything approaching what you would expect in a regular ed. classroom?  No."  (Doc. No. 8-32, p. 131).  There was no evidence presented regarding what A.S.'s chemistry lab consisted of or how it was different from a regular education chemistry lab.

With regards to Plaintiffs' argument that A.S.'s curriculum was improperly modified because A.S. was not required to produce written assignments, the evidence contradicts this assertion.  Thornhill testified about some of the written assignments that A.S. completed, including a paper A.S. wrote on the books <u>The Lord of the Rings</u> and <u>The Hobbit</u> and a paper on

---

[8]The evidence shows that most of A.S.'s tests were given orally.  (Doc. No. 8-32, p. 394).  Terri Bronson, the ESE Coordinator, testified that oral tests were an appropriate accommodation for A.S., and they could allow a teacher to ask more probing questions in order to better judge the student's knowledge.  (Doc. No. 8-32, p. 364).

how the amendments to the Constitution would apply to an imaginary planet that A.S. created.

(Doc. No. 8-32, p.387-89).   Thornhill also testified that while A.S. refused to write, Thornhill

constantly tried to get him to write and never stopped trying.   (Doc. No. 8-32, p. 386).

Furthermore, Plaintiffs did not meet their burden of showing that not requiring A.S. to write

when he refused to do so was a modification to the curriculum, rather than an accommodation.

Additionally, there was no definitive evidence that a research paper was a required part of the

curriculum.

Plaintiffs argue that Robert Thornhill, A.S.'s teacher for his last two years of high school,

testified that he modified A.S.'s curriculum.   Specifically, when asked about whether A.S. wrote

several long book reports, Thornhill stated the following:

> Thornhill: "We changed that for [A.S.] because–to make the accommodations for
> him, or modifying the curriculum so that he could pass, so that he would have
> success because of his refusal to write.
>
> Question: So you modified what you were requiring [A.S.] to do.
>
> Thornhilll: Yes.

(Doc. No. 8-32, p. 402).   While at first blush this may appear to show that Thornhill testified that

he improperly modified A.S.'s curriculum, a review of his statements in context shows that

Thornhill was using the words "accommodation" and "modification" somewhat interchangeably.

(Doc. No. 8-32, p. 399-402).   However, Plaintiffs did not present evidence in a clear manner

regarding what the curriculum should have been and how it was allegedly modified,[9] and as

---

[9]For example, Plaintiffs called Dr. Duncan to testify about what A.S. would have to learn
in order to earn the credits that he received.  The ALJ tried to clarify what Dr. Duncan meant
during some of her testimony, but Dr. Duncan's responses were often confusing and/or non-
responsive to the ALJ's questions.  (Doc. No. 8-32, p. 272-91).

such, they did not succeed in showing that Defendant improperly modified A.S.'s curriculum.[10]

### 2.  Instruction Time

Next, Plaintiffs argue that the ALJ erred when it found that A.S. earned his diploma, because A.S. did not receive 135 hours of bona fide instruction time per credit awarded, as required by Florida Statute § 1003.436(1)(a).  Plaintiffs argue that A.S. slept through a lot of his classes and the teacher's daily logs show limited time spent on each subject, and as such, A.S. could not have received 135 hours of bona fide instruction time per credit awarded.

A.S.'s father testified that he asked Thornhill to keep daily logs of how much time A.S. spent on each class subject and how much time he spent sleeping each day.  (Doc. No. 8-32, p.125-26).  A.S.'s father testified that one year, A.S. only spent an average of nine minutes per day on geometry.  (Doc. No. 8-32, p. 126).  However, A.S. took two years to complete geometry, and the only evidence regarding the amount of time spent in geometry the second year is that the log of seventeen days in January of 2004 showed that A.S. averaged fifteen minutes per day of geometry during those days.  (Doc. No. 8-32, p. 125-26, 137-38).  It is unclear as to how much time A.S. spent in geometry the other days during his second year of geometry.[11]  Therefore, Plaintiffs have not shown that A.S. did not actually receive 135 hours of instruction over the two

---

[10]Additionally, the Court notes that Terri Bronson, the ESE Coordinator, testified that Defendant "took the curriculum from the high school and implemented it in [A.S.'s classes] just exactly like they were doing it [in the high school]."  (Doc. No. 8-32, p. 369).

[11]It is also unclear whether the nine minutes per day of geometry for the first year was an average of all of the days of school for the first year that he took geometry or if it was only an average of the sixteen days in April 2003 that A.S.'s father specifically testified about.  (Doc. No. 8-32, p. 126, 137-38).

years that A.S. took geometry.[12]

Plaintiffs also argue that during A.S.'s last two years of high school, A.S. only spent a third of his day on academics the first year and 42% of his day on academics the second year. (Doc. No. 8-32, p. 126).  However, it is unclear whether these figures are for the entire two years, or if they just represent the sixteen days in April of 2003 and seventeen days in January of 2004.  As such, this is not sufficient evidence to meet Plaintiffs' burden.[13]

Plaintiffs also take issue with the fact that Thornhill read to A.S. for 40 - 50 minutes per day as part of his literature class.  (Doc. No. 8-32, p. 126).  Plaintiffs, however, have not shown that this was an improper instruction method.  Furthermore, after Thornhill read to A.S., he would periodically ask A.S. questions to make sure that A.S. was understanding what was being read to him.  (Doc. No. 8-32, p. 138, 390-91).

A.S.'s father also testified that A.S. spent an average of 37% of his day sleeping during the sixteen days logged in April of 2003 and 24% of his time sleeping during the seventeen days logged in January of 2004 .  (Doc. No. 8-32, p.137-38).  However, this Court is not persuaded by evidence regarding the average amount of  time that A.S. slept during several days of two months.

---

[12]A.S.'s father also testified as to the amount of time spent on other classes, but again, it appears that the times represented the average time spent during the sixteen days in April of 2003 and seventeen days in January of 2004.

[13]Furthermore, when A.S.'s teacher kept the logs of A.S.'s time, he separated the time into time spent on specific subjects, time spent sleeping, and "remainder."  A.S.'s father testified that remainder portion represented time spent on things that A.S. wanted to do, social things, and open time.  (Doc. No. 8-32, p. 137).  It appears to this Court that while this "remainder" time was not specifically designated to a specific academic subject, it was not shown that this time did not have any academic relevance.

If Plaintiffs are trying to show that A.S. did not earn his credits because he did not

receive 135 hours of instruction per credit awarded, Plaintiff should have presented more

thorough evidence on this issue.  Instead, A.S.'s father testified about specific amounts of time

spent  during several days of two months.  Furthermore, Plaintiffs did not really explore this

issue with Thornhill, who was actually present in the classroom with A.S.  Thornhill testified

that on some days, A.S. "would sleep maybe 30 minutes, some days he would sleep an hour,

there were a few occasions where he slept almost all day."  (Doc. No. 8-32, p. 383).  However,

Plaintiffs did not ask Thornhill any specific questions about how much time was spent on

academics, beyond asking Thornhill whether he considered A.S.'s sleeping to be an impediment

to A.S.'s instruction, to which Thornhill answered that it was not an impediment.[14]  (Doc. No. 8-

32, p. 383).  As such, the Court finds that there was not sufficient evidence for Plaintiffs to meet

their burden to show that A.S. did not receive 135 hours of instruction per credit hour awarded.

### 3.  Credits Awarded

Next, Plaintiffs argue that the ALJ erred when it found that A.S. earned his diploma,

because A.S. did not earn the credits that he was awarded.  To support this contention, Plaintiffs

called Dr. Duncan to testify.

Dr. Duncan is a psychologist.  (Doc. No. 8-32, p. 160).  She met with A.S. two times for

approximately seven hours total.  (Doc. No. 8-32, p. 179).  She opined that A.S. did not earn all

of the credits that he was awarded, and she based her opinion on her review of A.S.'s work

samples, performing academic achievement testing on A.S., and performing an informal

---

[14]Plaintiffs also asked Thornhill whether it was fair to say that A.S. slept 30% of the day one year, to which Thornhill replied that he did not know.  (Doc. No. 8-32, p. 383).

24

assessment of A.S.  (Doc. No. 8-32, p. 196-197).  Dr. Duncan opined that A.S. is unable to

analyze or perform critical thinking and that he writes at a second grade level, and as such, he

could not have earned all of the credits that he was awarded.  (Doc. No. 8-32, p. 183, 204, 207,

267, 269, 302).

        The Court does not find Dr. Duncan's opinion to be persuasive.  A.S. passed the writing

portion of the FCAT, which was graded by two independent evaluators and indicates that A.S.'s

writing abilities are greater than that described by Dr. Duncan.  (Doc. No. 8-32, p. 305-06).

Additionally, Dr. Duncan based her opinion in part on A.S.'s work samples, but the work

samples were not a comprehensive, representative sample of A.S.'s work, because a lot of A.S.'s

work was oral and the work sample only consisted of written samples that the school happened

to keep.  (Doc. No. 8-32, p. 366-67).

        Furthermore, Dr. Duncan's testimony conflicted with Terri Bronson's testimony

regarding what A.S. had to learn in order to legitimately earn credit for his classes.  Bronson

testified that there are particular criteria that have to be met in order to receive credit.  (Doc. No.

8-32, p. 346).  Specifically, Bronson testified that in order to earn credit for his classes, A.S.

would have to pass the Sunshine State Standards that go along with each course and that those

standards are embedded in the curriculum, textbooks, and course work for each course.  (Doc.

No. 8-32, p. 346-47, 361).  Additionally, Bronson testified that a student can still earn credit for

a course without passing all of the Sunshine State Standards associated with the course.  (Doc.

No. 8-32, p. 347, 363, 367).  Finally, Bronson testified that Thornhill taught A.S. the Sunshine

State Standards.  (Doc. No. 8-32, p.370).

        Additionally, Dr. Duncan's testimony also conflicted with Thornhill's testimony

regarding A.S.'s capabilities.  Thornhill testified that A.S. can perform critical thinking.  (Doc.

No. 8-32, p. 387).  Thornhill taught A.S. for two years, whereas Dr. Duncan only met with A.S.

for approximately seven hours, so it is understandable that the ALJ gave more weight to

Thornhill's testimony over Dr. Duncan's testimony.

After reviewing the transcript of the administrative hearing, the Court finds that Plaintiffs

have not met their burden of showing that A.S. did not earn the credits that he was awarded.

While there was some evidence that A.S. did not earn the credits that he was awarded, the ALJ

did not err in choosing to give more weight to Bronson and Thornhill's testimony than that given

to the conflicting testimony of Dr. Duncan.

### 4.  Progress on IEP Goals and Objectives

Next, Plaintiffs argue that the ALJ erred when it found that A.S. earned his diploma,

because A.S. did not meet all of the goals and objectives of his IEPs.  Two district courts outside

of the Eleventh Circuit have held that in order "[t]o graduate a student with a disability under the

IDEA, the student must meet the general graduation requirements and make progress on or

complete the IEP goals and objectives."  Kevin T. v. Elmhurst Community School Dist. No. 205,

No. 01 C 0005, 2002 WL 433061, at *14 (N.D. Ill. March 20, 2002)(citing Chuhran v. Walled

Lake Consolidated Schools, 839 F. Supp. 465, 474 (E.D. Mich. 1993).  However, the Kevin T.

court cited the Churan court for this proposition, and the Churan court cited an unpublished

opinion from the Fourth Circuit, Gorski v. Lynchburg School Board, (the text of which is not

available in Westlaw or Lexis) to support this holding.  See Churan, 839 F. Supp. at 474 (citing

Gorski v. Lynchburg School Board, 875 F.2d 315 (4th Cir. 1989)).  Since the text of the Gorski

opinion is unavailable, it is unclear as to why these courts held that in order to graduate a student

26

with a disability under the IDEA, the student must meet the general graduation requirements and make progress on or complete their IEP goals and objectives.  As such, this Court is not persuaded by these non-binding cases.[15]

Furthermore, this Court does not interpret the IDEA to impose the additional requirement of progress on IEP goals and objectives on disabled students that is not imposed on non-disabled students in order to graduate with a regular high school diploma.  The purpose of the IDEA is to open the doors of education to disabled students.  If a disabled student legitimately earns the credits required to graduate with a regular diploma and satisfies any other state imposed graduation requirements, nothing more is required in order for the disabled student to graduate with a regular high school diploma.  If the disabled student satisfies the requirements for a regular high school diploma but did not make progress on one or more of the goals or objectives in his or her IEP, the student can seek compensatory education for the alleged deficiency.

---

[15]Additionally, at the hearing, Plaintiffs cited another non-binding case, Helms v. Independent School District No. 3 of Broken Arrow, Tulsa County, Oklahoma, 750 F.2d 820 (10th Cir. 1984), to support their position that A.S. must make progress on his IEP goals and objectives in order to graduate.  The Court, however, does not find this case persuasive either.

In Helms, the student at issue was classified as a "Trainable Mentally Handicapped" student.  See id. at 821.  The court noted that for non-handicapped students, there was a standardized course content with a specific performance level that must be achieved in order to proceed to the next grade level.  See id. at 824.  However, the court stated that standard education was not feasible or required for handicapped children under the predecessor statute to the IDEA, and as such, a handicapped child's progression from grade to grade was measured by reference to his or her IEP, rather than based on a standardized curriculum.  See id.  Therefore, the court stated that "[i]t would make a farce of the clear intent of Congress to interpret [the predecessor statute to the IDEA] as allowing that a handicapped child could fail to meet his or her IEP objectives and yet advance a grade level."  Id. at 825.

The Helms case is distinguishable from the instant case.  In the instant case, Plaintiff earned a regular high school diploma.  In order to graduate with a regular diploma, Florida law required that modifications to A.S.'s basic courses not include modifications to the curriculum frameworks or student performance standards.  Fla. Admin. Code Rule 6A-6.0312.

### 5.  Conclusion Regarding Graduation

Based on the above, the Court finds that the ALJ did not err in finding that A.S. earned his high school diploma.  As such, the Court grants Defendant's motion on this issue.

### B.  Count II

Defendant argues that the Court should dismiss Count II, since it simply requests remedies and is not an independent cause of action.  In Count II, Plaintiffs request injunctive relief enforcing A.S.'s stay-put rights and compensatory education.

Defendant cites no authority for its contention that Count II should be dismissed. Accordingly, the Court denies Defendant's motion on this issue.

### C.  Attorney's Fees

Defendant argues that Plaintiffs' request for attorney's fees under § 1988 is not available for a violation of the IDEA.  However, Plaintiffs have sought relief under § 1983, and § 1988 is the attorney's fee provision for § 1983 claims.  Therefore, the Court denies Defendant's motion on this issue.

### D.  Count IV

Defendant argues that Count IV is duplicative of Count I and should be dismissed.  In Count I, Plaintiffs request a review of the administrative determinations of the ALJ under the IDEA, whereas in Count IV, Plaintiffs request a review of the administrative determinations of the ALJ under state law.  While both counts seek review of the ALJ's determination, one is under the IDEA and the other is under state law, and as such, Count IV is not improper. Therefore, the Court denies Defendant's motion on this issue.

**VI.  Conclusion**

Accordingly, it is ORDERED AND ADJUDGED that:

(1)     Plaintiffs' Motion for Summary Judgment (Doc. No. 74) is **GRANTED IN**

**PART AND DENIED IN PART**: The motion is granted to the extent that the

Court finds that the ALJ erred in refusing to consider the issues of FAPE and

Plaintiffs' challenge to the February 23, 2004 IEP; otherwise, the motion is

denied.

(2)     Defendant's Motion for Judgment on the Record (Doc. No. 73) is **GRANTED IN**

**PART AND DENIED IN PART**: The motion is granted to the extent that the

Court finds that the ALJ did not err in finding that A.S. earned his high school

diploma; otherwise, the motion is denied.

**DONE AND ORDERED** at Tampa, Florida, this 7th day of October, 2005.

SUSAN C. BUCKLEW
United States District Judge

Copies to:
Counsel of Record